PULLMAN INCORPORATED, Plaintiff-Appellant,

v.

ACF INDUSTRIES INCORPORATED, Defendant-Appellee.

No. 265, Docket 31598.

United States Court of Appeals
Second Circuit.

Argued Jan. 24, 1968.

Decided April 4, 1968.

**84**

David S. Kane, New York City (Kane, Dalsimer, Kane, Sullivan & Smith, Martin E. Goldstein, New York City, Haynes N. Johnson, Stamford, Conn., Robert C. Brown, Jr., John M. Mann, Chicago, Ill., of counsel), for appellant.

John Hoxie, New York City (Davis, Hoxie, Faithfull & Hapgood, Cyrus S. Hapgood, Laurence R. Hefter, New York City, of counsel), for appellee.

Before MEDINA, MOORE and ANDERSON, Circuit Judges.

MOORE, Circuit Judge:

This appeal involves the validity and alleged infringement of United States Patent No. 3,003,436 which issued to William H. Peterson on October 10, 1961, on an application dated December 3, 1959, which incorporated therein an application dated March 5, 1959. Plaintiff-appellant Pullman Incorporated (plaintiff) has been the owner of the Peterson patent since issuance. On October 16, 1961, it filed its complaint in the United States District Court for the Southern District of New York claiming infringement; the answer of ACF Industries Incorporated (defendant) denied infringement and set up the defense that the patent was invalid because the patented subject was "obvious" within the meaning of 35 U.S.C. § 103.[1]

The patent relates to a cushion for a "cushion-underframe" freight railroad car—the most popular type of railroad freight car today. Before that type of freight car appeared, the lading inside a car was prevented from feeling the full force of collisions with other freight cars—such as occur when a train is being assembled—by something called a "draft gear," normally a rubber or friction unit with less than three inches of yield. Draft gears reduced the impact by providing a cushioning effect but the protection afforded was found to be insufficient. The "cushion-underframe" car was designed in the late 1920's to provide more lading protection. In this type of car, the couplers are mounted, frequently through draft gears, to the ends of a sliding sill, a long member which slides through a channel that runs the whole length of the car. When a car is hit, the sliding sill slides, cushioning the impact by the need to overcome the friction of the sill against the channel walls. In addition, there is a cushioning mechanism that connects the sill to the car underframe so that the car does not receive the same jolt as the sill.

Despite these improvements, damage to fragile lading continued to occur and the railroads saw some of their freight being diverted to trucks as a result. The search for a better cushion continued and in the 1950's plaintiff brought out a compressible rubber unit which had 8 inches of travel providing still more cushioning effect. "Travel" is the dis-

---

1. 35 U.S.C. § 103 provides:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

tance that a unit moves before it reaches its point of maximum compression or give. Thus, a standard 10-inch-long spring will have approximately 9 inches of travel if it is one-inch long when it is fully compressed. The Southern Pacific began using the "Hydra-Cushion," which has a 10-inch travel, in the mid-1950's. This was a more advanced unit as it applied hydraulic principles to the cushioning problem.

A hydraulic unit is superior to a cushion relying on rubber or a spring because it can be designed to offer uniform pressure against impacts for the entire length of its travel (a so-called constant-force cushion), unlike rubber or springs which have a substantial amount of give at first but which quickly increase in the amount of resistance offered. They can thus "go hard" or offer no cushioning effect before the entire amount of the impact force has been absorbed. At high speed impacts the hydraulic unit has the same limitation but it can offer more cushioning effect for the same amount of travel than other types of cushion.[2] The hydraulic unit furthermore dissipates the energy it receives, avoiding the recoil inherent in energy compressing devices such as springs.

For several years the ten-inch cushion was the standard of the industry, but lading damage continued to exist. In 1958 Peterson, an engineer in plaintiff's research department, conducted tests with longer travels than the normal ten inches. By empirical testing he found that an increase in travel length from 10 to 20 inches greatly reduced the lading force—i. e., the force of the end wall of the car against the lading when the car is jolted. He made tests that showed that travels of 20 to 40 inches would protect "resilient lading" such as cartoned canned goods, one of the most fragile types of lading, under almost all freight yard conditions. It was well known that the average impact speed in freight yards was around 10 mph and impacts at up to 15 mph were not uncommon. The original draft gear was designed to cushion impacts at only 3–4 mph and the "Hydra-Cushion" simply extended this same level of protection to impacts of 9–10 mph. To protect against impacts of 9.5 mph Peterson discovered that 19 inches of cushion travel were needed—using an energy dissipative cushion, i. e., a hydraulic or hydraulically operated friction unit—and that to protect against speeds up to 14.2 mph 32½ inches of travel were required. Plaintiff applied this knowledge to the cushions then in use and received a patent (in 1962) for a cushion described in Claim 1 of the patent as follows:

"In a railway freight car adapted to carry a shiftable load thereon, the combination of a car underframe, couplers at each end of the underframe, a load carrying body supported by the underframe and longitudinally movable relative to the couplers, and a cushioning device interposed between the couplers and said body, said cushioning device having energy transferring and dissipating characteristics equivalent to a 100% efficient cushioning mechanism having a cushion travel in one direction within the range from about 20 inches to about 40 inches, and in which, for an impact of 10 miles per hour delivered to one of said couplers by another car, the cushioning device will not close in less than about .23 second, said cushioning device having a cushion stroke length for closing in one direction of not more than about 40 inches."

The Patent Examiner and plaintiff have summarized the essential characteristics of the cushion as:

"1. high energy absorption
2. substantially dissipative energy system travel characteristics

---

2. It is therefore considered more "efficient." A cushion that produces a uniform amount of resistance throughout its travel (an engineering concept not achievable in practice) is defined as 100% efficient. The hydraulically controlled friction plate cushion plaintiff used in its testing program had an efficiency of close to 100%.

3. substantially constant force-travel cushion

4. a range of travel (i. e., 20–40 inches) extended over a sufficient closing time, so applicant's desired results will be obtained."

■ These patent claims encompass all hydraulic cushions (and other energy dissipative devices) having an efficiency of close to 100% (constant-force cushions) and a travel of from 20–40 inches, and cushions equivalent thereto.[3] The patent, in conjunction with the doctrine of equivalence, therefore stakes out a monopoly on the most popular size and type of cushion used in the industry. The trial judge came to the conclusion that the patent was invalid because plaintiff's cushion would have been obvious to the ordinary man skilled in the art. 35 U.S.C. § 103. We agree.[4]

■ Plaintiff's first objection to the decision below is that it failed to make a finding as to the level of skill that this person "reasonably skilled in the art" was deemed to have. See Graham v. John Deere Co. of Kansas City, 383 U.S. 1, 37, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Plaintiff argues that since the patent law uses a "specialized reasonable man test for obviousness" (Formal Fashions, Inc. v. Braiman Bows, Inc., 369 F.2d 536 (2d Cir. 1966)), an explicit definition of this man's level of skill is a necessary foundation to a determination of obviousness. While this might be true in some cases, the District Court was correct in concluding that "manifestly, this 'hypothetical mechanic' would be familiar with the principles of cushioning and with the application of cushioning devices to the protection of car and lading." 269 F.Supp. at 298 n. 9. Plaintiff's other objections to the decision of the District Court simply amount to denials that the patented cush-

ion was obvious within the meaning of § 103. We therefore turn to that broad issue.

Plaintiff does not, and of course could not, claim to have invented all types of cushions. To obtain the patent Peterson had to limit his claims of invention to a cushion that brought about the protection of resilient lading at impact speeds in excess of 9 mph by a means not obvious to those skilled in the art. To narrow the issue of what advances, if any, plaintiff's cushion had made over the prior art, the parties have stipulated that prior to June 1955 the following combination was in public use as described in printed publications:

"A car underframe, a draft & buffing column (sill) carried by the underframe and capable of longitudinal movement relative thereto, couplers with draft gears operatively connected thereto at opposite ends of the column, a load carrying body supported by the underframe and longitudinally movable relative to the column and couplers, means for supporting said underframe for travel over the rails of a track, and dissipative energy type cushioning means interposed between the underframe and the column for providing cushioning therebetween through a certain maximum distance of cushion travel in each direction."

To distinguish his cushion from this prior art, plaintiff proposes that it be of the 100% efficient or constant-force energy-dissipative type (with certain allowances for design limitations). However, plaintiff admits that the 10-inch Hydra-Cushion which antedated his cushion, was a constant-force energy-dissipative cushion, and the District Court was, therefore, correct in determining that the constant-force specification would be an obvious method of ob-

---

3. The patent states that a decrease in efficiency can be compensated for by an increase in travel, and asserts as equivalent (and therefore infringing) all devices that have the same minimum closure time afforded by a constant-force cushion. See 269 F.Supp. at 297.

4. We therefore do not decide the issues of anticipation under 35 U.S.C. § 102 (no finding below) and infringement (court below held that there was a failure of proof by plaintiff on this point).

taining the most cushion per inch of travel. The only reason why one would not use this type of cushion would be to allow for a short build-up to maximum resistance or "soft nose" to cushion further the initial impact. Plaintiff's patent does not necessarily exclude such a cushion because it provides that his invention covers all travel lengths *equivalent* to a 20–40 inch travel with a 100% efficient cushion. Thus there is nothing critical about the specification of a constant-force cushion since a 60% efficient cushion would infringe plaintiff's patent if it had a long enough travel.

It is, therefore, clear that the length of travel and closing time are the only differences between plaintiff's cushion and the prior art as represented by the 10-inch Hydra-Cushion.[5] The closing time of a cushion is simply the length of time that the cushion can offer resistance to an impacting force. Plaintiff proposes that his cushion have a closing time of not less than .23 seconds for impacts of 10 mph. The theory behind plaintiff's closing time requirement is that a cushion should absorb all the energy of the impact for which it is designed before reaching the end of its travel and "going solid." Thus, the closing time specification is just a sophisticated way of saying that the cushion should be built to avoid jolts to the car and lading. Since plain-

tiff has specified a 100% efficient cushion, this result (no jolts) can be expressed in terms of travel length or in terms of closing time, the two being opposite sides of the same coin. They are mathematically equivalent.[6] Since the constant-force cushion is not patentable (by itself), the closing time formulation adds nothing, except perhaps confusion.

Finally, we come to the heart of the case. Plaintiff argues that his "invention" is not obvious because the prior art was stuck in the rut of short travel cushions—two of the more popular being the 10-inch Hydra-Cushion and the 8-inch rubber cushion manufactured by plaintiff. Plaintiff's patent calls for an increase in travel, the proposed cushion having a minimum of 18.6 inches travel and a maximum of 42.8 inches (20–40 inches plus or minus 7%). Plaintiff argues that no one considered using a longer travel length before because those skilled in the art believed that lading force (the force against the lading which causes damage) was proportional to the coupler force at the moment of impact. Thus, plaintiff admits that those skilled in the art would think it obvious to lengthen the cushion travel to provide more lading protection [7] but he argues that they did not do so because they were under a misapprehension as to the applicable laws of mechanics. Under this

5. The 20-inch model of the Hydra-Cushion (a hydraulically controlled friction plate unit) is one of the three cushions sold by defendant that it is alleged infringe plaintiff's patent. The others are the "Freight Saver" which is made with travels of 20 inches and 30 inches and the "Shock-Control" or Keystone cushion having a travel of 20 inches. The court below found that the only difference between plaintiff's claimed invention and the 10-inch Hydra-Cushion was in cushion travel and closing time. He also found that the later 20-inch Hydra-Cushion model was of comparable efficiency to the earlier one. 269 F.Supp. at 297.

6. The relationship can be expressed as

$$T = \frac{2d}{V},$$ where $T$ = time, $d$ = travel, and $V$ = impact speed. The formula is more complicated if the cushion is not

of the constant-force type, but it is still a direct relationship.

7. In a paper published in 1929 O. C. Duryea, the inventor of the cushioned underframe car stated:

A shock or blow can be expressed or measured only by means of two units: The unit of FORCE and the unit of TRAVEL. Shock cannot be defined as pounds of force, for shock is energy and must be expressed by a compound unit such as foot-pounds. The factor, TRAVEL, therefore demands a yielding of the body which is to receive the blow. When a car structure is subjected to an impact, the force acting on the car will be large if the yield is small, but if the yield is made large, the force will be small. Therefore, to effectively cushion end shocks, sufficient yield must be provided so that the force will not be destructive.

"proportionality" or "coupler force" theory one would conclude that, to provide the same protection that Peterson's cushion does at 20 inches, one would have to use approximately 40 inches of travel. See Plaintiff's Exhibit No. 178, infra. In connection with increases in travel length, it should be noted that increasing the travel has the disadvantages of (1) increasing the distance between cars, making it difficult to hop from one to another, (2) causing difficulty in coupling, uncoupling, and making sharp turns, and (3) increasing the slack or bellows-effect in a train of cars. Increased slack is disadvantageous because lading damage due to sudden stops is directly proportional to the amount of slack between cars which, since they do not decelerate at the same rate, collide with each other.

As a result of empirical tests, Peterson found that lading force is not proportional to coupling force, but that at impact speeds of 10 mph lading force is disproportionately reduced by an increase in travel from 10 to 20 inches. This "disproportionality" is caused by the fact that at impact speeds over 4 mph or thereabouts, the acceleration of an uncushioned car is so rapid that lading friction with the floor of the car is overcome and the lading tends to slide toward the end wall causing increased lading compaction and damage. If the acceleration or jolt can be reduced, the lading will tend to stay where it belongs, reducing the amount of compaction. According to plaintiff, those skilled in the art did not take this factor into consideration, but simply calculated the coupling force that the old draft gear could handle (3–4 mph) and extended those computations to higher impact levels. Since coupler force increases by the square of increases in speed of impact, the "proportionality" theory would call for greatly increased travel lengths. The District Court found that there was no documentation for this assertion as to the prior state of the art but that in any event, all plaintiff was claiming was that he had discovered that a known cushion with a certain travel length provided more protection than was previously thought.

The District Court found (269 F.Supp. at 298) that "even on plaintiff's premise [as to the prior state of the art], then, it would have been 'known' that lading forces could be halved by increasing cushion travel from 10 to 20 inches. With that point conceded, such an extension seems 'obvious' as a matter of law. In any event, it is obvious as a matter of fact." The correctness of that conclusion can be illustrated by figures provided by plaintiff's expert.[8] For impacts of 10 mph it was admitted that increasing the travel of a hydraulic cushion from 10 inches to 20 inches would reduce *coupler force* from 3200 to 1600 lbs. sq. ft. for tightly packed or tied down lading of a certain weight. Thus, it was obvious to those skilled in the art that this increase in travel would protect cartoned canned goods for which Peterson and others had determined a damage level of 2000 lbs. sq. ft. On the same theory, a 32-inch travel would reduce the lading force to a safe level for cartoned bottled goods for which Peterson had set a damage level of 1000 lbs. sq. ft.

Plaintiff correctly points out that under certain circumstances a slight change in an old combination can be a patentable invention, Eibel Process Com-

8. Plaintiff's Exhibit No. 178:

| Travel (inches) | 2½ | 10 | 20 | 30 | 40 |
|---|---|---|---|---|---|
| Lading Force (no friction) | 12,800 | 3,200 | 1,600 | 1,066 | 800 |
| Lading Force (50% friction) | 12,000 | 2,400 | 800 | 266 | Zero |
| Acceleration (no friction) | 8g | 2g | 1g | 0.66g | 0.5g |
| Acceleration (effective with 50% friction) | 7.5g | 1.5g | 0.5g | 0.16g | Zero |

pany v. Minnesota & Ontario Paper Co., 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Georgia-Pacific Corp. v. United States Plywood Corp., 258 F.2d 124 (2d Cir.), cert. den. 358 U.S. 884, 79 S.Ct. 124, 3 L.Ed.2d 112 (1958), but that principle has no application here. The *Eibel* case involved a minor modification in a paper-making machine which allowed it to attain higher paper-making speeds without damaging the paper web. Although he simply increased the pitch of a wire screen belt on which the pulp travels prior to being rolled and dryed, Eibel succeeded in eliminating the previously unresolved problem of paper rippling which had theretofore stood as a barrier to the use of increased speeds. The Court in *Eibel* made it clear that it was not departing from the rule laid down in Smith v. Nichols, 88 U.S. 112, 119, 22 L.Ed. 566 (1874) that "a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree * * * doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent." It stated (261 U.S. at 68, 43 S.Ct. at 330) that the paper-making machine invention "was not the mere use of a high or substantial pitch to remedy a *known source* of trouble. It was the discovery of the source [of the rippling] not before known and the application of the remedy, for which Eibel was entitled to be rewarded in his patent. Had the trouble which Eibel sought to remedy been the well known difficulty of too great wetness or dryness * * * and had he found that a higher rather than a lower pitch would do the work better, a patent for this improvement might well have been attacked on the ground that he was seeking monopoly for a matter of degree," since others had proposed increasing the pitch slightly to facilitate drainage. Similarly, Peterson solved no problem which had been a barrier to the use of increased travel length, he merely discovered that this solution to an old problem deserved more consideration by the industry.

Plaintiff's reliance on *Georgia-Pacific* is also misplaced because in that case the tendency of Douglas fir plywood to crack or "check" as it expands and shrinks with moisture change was solved by a novel deep-grooving process, a new solution to an old problem. There was no prior knowledge of a relation between the form or depth of a groove in such wood and the tendency of the wood to crack. Lengthening cushion travel, on the other hand, was an obvious means of reducing lading damage. The world did not have to await a Peterson to discover that the force of an impact is lessened by spreading it over a distance. The prizefighter knows this when he rolls with the punch; the ballplayer when he makes a catch. Furthermore, the evidence indicates that the Southern Railway had also experimented with longer travel lengths and that it was the moving force behind plaintiff's decision to market a 20-inch cushion.

Nor is the obviousness of plaintiff's invention changed by the fact that the 20-inch cushion is now enjoying considerable commercial success, with many 30-inch ones being sold as well. There is apparently considerable resistance to change in the railroad industry, especially when it involves changes in something like the relatively new hydraulic cushion, and there are disadvantages to increasing travel length which have been referred to above. The District Court was justified in concluding that the railroads did not immediately adopt the expedient of increasing travel length because of these factors and not because of ignorance as to the benefits of longer travel cushions. Indeed, recent figures show that there is still a substantial demand for cushions having only 8–11 inch travels (269 F.Supp. at 306 n. 24). The plaintiff's contention that the District Court did not give sufficient weight to the commercial success of the patent and the long-felt need for more lading protection is thus without merit.

We conclude as did the court below that at best Peterson "could claim only to have gained pioneering data" about the increase in lading protection afforded by longer cushion travels. However useful such measurements may be, they cannot turn an obvious extension of the prior art into a patentable invention.

Affirmed.