NIPPON ELECTRIC GLASS COMPANY, LTD., Plaintiff,

v.

Edward E. SHELDON, Defendant.

ASAHI GLASS COMPANY, LTD., Plaintiff,

v.

Edward E. SHELDON, Defendant.

Edward E. SHELDON, Plaintiff,

v.

SONY CORPORATION OF AMERICA, Defendant.

Nos. 79 Civ. 2525 (RLC), 80 Civ. 2654 (RLC) and 80 Civ. 5321 (RLC).

United States District Court, S. D. New York.

May 21, 1982.

Hopgood, Calimafde, Kalil, Blaustein & Judlowe, New York City, for plaintiff Nippon Elec. Glass; John M. Calimafde, Frank Murphy, William Botjer, New York City, of counsel.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, and Oblon, Fisher, Spivak McClelland & Maier, P. C., Arlington, Va., for Asahi Glass Co.; Jay L. Himes, New York City, Arthur I. Neustadt, Richard D. Kelly, Arlington, Va., of counsel.

Spellman, Joel & Pelton, Robert J. Eichelburg, White Plains, N.Y., for Sheldon; Martin J. Spellman, White Plains, N.Y., of counsel.

## OPINION

ROBERT L. CARTER, District Judge.

Three actions concerning the validity and infringement of patents pertaining to color television picture tubes were consolidated and tried before a jury on April 20–23, 1982. At the conclusion of the presentation of the evidence, the court, having concluded that without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, a reasonable minded jury would be compelled to render a verdict for the corporate parties, *see Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir. 1970), took the case from the jury. The motions for directed verdict were granted because viewing the evidence in the light most favorable to Sheldon, "the evidence [was] so strongly and overwhelmingly in favor of [his opponents] that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against [them]." *Armstrong v. Commerce Tankers Corp.*, 423 F.2d 957, 959 (2d Cir.), *cert. denied*, 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970) (citations omitted); *Noonan v. Midland Capital Corporation*, 453 F.2d 459, 461 (2d Cir.), *cert. denied*, 406 U.S. 495 (1972); *Mattivi v.*

*South African Marine Corp., "Huguenot"*, 618 F.2d 163, 167 (2d Cir. 1980). Most recently in *Daddi v. United Overseas Export Lines, Inc., "Oriental Inventor"*, 674 F.2d 175, at 177 (2d Cir. 1982), the above principle has again been reaffirmed as the controlling yardstick to be utilized in directed verdict determinations.

In dispute are two patents awarded to Dr. Edward Sheldon, United States Patents Nos. 3,543,073 ("'073 patent") and 3,610,994 ("'994 patent") for "Vacuum" and "Cathode-ray" "Tubes of Television Type for X-ray Protection[.]" Dr. Sheldon elected claim 1 of the '073 patent as a representative claim of both patents.[1] Among its salient characteristics are a vacuum tube for color television comprising electronic parts to generate a beam of free electrons, a fluorescent screen that produces a multicolor television image, and a shielding mechanism to reduce X-ray emission through the face plate "to the amount smaller than 0.04 milliroentgen per hour [mr/hr][2] measured at the distance of 5 cm. from said face plate, ... with said tube operating at 30 kv. potential and with said beam being of the standard amperage used in color television tubes ...."

■ The action commenced as a suit for declaration of patent invalidity brought by Nippon Electric Glass Company, Ltd. ("NEG") against Sheldon. A similar action was filed by Asahi Glass Company, Ltd. ("Asahi") soon afterward. NEG and Asahi manufacture glass envelopes that are used in the production of television sets, and they are the principal supplier of these envelopes for Sony Corporation of America ("Sony"), a large producer of color televisions. In response to the suits against him, Sheldon initiated a lawsuit for patent infringement against Sony.[3] Before trial,

---

1. By stipulation this claim was construed to include two elements not found in claim 1 of the '073 patent: a shadow mask and a light filtering means included in the face plate. The novelty or patentability of these elements alone was not advanced by Sheldon.

2. A roentgen is a unit of measurement of radiation. A milliroentgen is $1/1000$ of a roentgen.

3. Because the patents cover color television tubes and not merely their glass envelope, the primary infringement would occur through the sales of the complete tubes by Sony. NEG and Asahi could be liable for contributory infringe-

Sony entered into a stipulation with Sheldon, the substance of which conceded that if the patents are valid, then Sony has marketed televisions infringing the patents.

Sheldon is a radiologist by training and profession. Sometime in late 1965 or early 1966 he had a "premonition" that color televisions emitted unsafe levels of X-radiation. He pursued this hunch with some testing and experimentation and eventually became convinced that the sets were unsafe. In particular, Sheldon's research convinced him that while the emissions from color televisions operating under normal conditions presented no danger to the viewer, when the set operated abnormally, that is, in excess of designated voltage limits, the potential harm from excess radiation was great. Sheldon's patents were a result of this "discovery."

Dr. Sheldon testified that he studied the literature for about a year without discovering any discussion of the problems. In the second half of 1966, he wrote a report, *Danger of Eye Cataracts from X-rays Produced by Home TV Receivers.* Simultaneously, he pursued through the United States Patent Office several patent applications that pertain to radiation safe color television tubes.[4] In September or October, 1967, he testified before a Congressional Committee about the danger. At that time there was no federal legislation on the subject. The Underwriters Laboratories, the testing arm of the industry, recommended a maximum emission level of 2.5 mr/hr. The National Council of Radiation Protection recommended 0.5 mr/hr under normal operating conditions. Sheldon advocated a prescribed limit of 0.4 mr/hr under all conditions.

Sheldon's patents suggest that safe tubes could be produced without changing their basic components of an electron beam "gun" and a fluorescent screen contained within a glass tube, if the glass was made more resistant to radiation transmission by enhancing its radiation absorption characteristics. Sheldon candidly admitted, however, that he is not a glass technologist and that "the glass is not my invention." Transcript ("Tr.") 674. His contribution to the art, or so he claims, is teaching the need to provide greater protection. The gravamen of NEG's and Asahi's complaint is that this statement to the industry cannot satisfy the minimum threshold for patentable subject matter.

To qualify for a patent, a person must invent or discover some "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof ..." 35 U.S.C. § 101 (1976). No precise scope for patentability has been delineated; the issue is a recurrent source of Supreme Court litigation that has stressed the thinness of the line between the patentable and the unpatentable. *See, e.g., Diamond v. Diehr*, 450 U.S. 175, 101 S.Ct. 1048, 67 L.Ed.2d 155 (1981); *Parker v. Flook*, 437 U.S. 584, 589, 98 S.Ct. 2522, 2525, 57 L.Ed.2d 451 (1978). Clearly excluded from the realm of patentable subjects are " '[p]henomena of nature, though just discovered, mental processes, and abstract intellectual concepts ..., as they are the basic tools of scientific and technological work.' " *Parker v. Flook, supra*, 437 U.S. at 589, 98 S.Ct. at 2525 (*quoting Gottschalk v. Benson*, 409 U.S. 63, 67, 93 S.Ct. 253, 255, 34 L.Ed.2d 273 (1972)). This proscription is tempered by the recognition that a practical application of laws of nature is protected by the patent monopoly. Sheldon's ability to satisfy the § 101 requirements for patentability thus turns, in part, on whether his "invention" is correctly described as mere observations of the inher-

---

ment if Sony was found to be an infringer because their glass tubes are essential elements of Sony's televisions.

4. Although much has been made of Sheldon's tactics before the United States Patent Office and his relationship with some of the examiners, his alleged misconduct did not contribute to the court's decision and therefore will not be recounted at length. It is sufficient to note that after abandoning several applications that were denied because of lack of novelty, obviousness in light of the prior art, or lack of patentable subject matter, Sheldon finally succeeded in having an examiner approve the two patents at issue here.

ent tolerance of the human body for X-radiation and of the radiation potential of commercial television sets or as a design for a television tube that combines those observations with a knowledge of picture tube construction to reveal how to manufacture a safe television.

■ Of course, satisfying the subject matter requirement of § 101 would not fulfill all of Sheldon's obligations under that section. Sheldon's apparatus, to qualify for a patent, must also be "novel[.]" The novelty requirement, which finds greater specificity in 35 U.S.C. §§ 102, 103 (1976), precludes patenting devices substantially identical to existing articles whose elements perform substantially the same work in substantially the same manner. *E.g., American Seating Co. v. National Seating Co.,* 457 F.Supp. 444, 452 (N.D.Ohio 1976), *aff'd,* 586 F.2d 611, (6th Cir. 1978), *cert. denied,* 441 U.S. 907, 99 S.Ct. 1999, 60 L.Ed.2d 377 (1979). In particular, courts will not permit an inventor to hold a protected monopoly on an apparatus that differs from prior incarnations solely due to substitution of a known substance for another performing essentially the same purpose. *See, e.g., Griffith Rubber Mills v. Hoffar,* 313 F.2d 1, 3–4 (9th Cir. 1963); *E. H. Tate Co. v. Jiffy Enterprises, Inc.,* 196 F.Supp. 286, 298 (E.D.Pa.1961), *aff'd,* 306 F.2d 240, 243 (3rd Cir.), *cert. denied,* 371 U.S. 922, 87 S.Ct. 289, 9 L.Ed.2d 230 (1962).

■ The evidence presented at trial left no viable question whether Sheldon invented a "new and useful process, machine, manufacture or composition of matter, . . . ." Even granting Sheldon the presumption of validity that accompanies his patent,[5] the court could find no credible evidence that Sheldon satisfied the subject matter and novelty requisites of § 101. Perhaps the most compelling evidence of

the patents' shortcomings came from Sheldon's own testimony. On cross-examination he conceded that all the constituents of his claim other than the prescription of the limit of 0.04 mr/hr on transmitted X-radiation were well known prior to his patent. Tr. 187–208, 223. By his own account, thus, Sheldon attempted to patent a desired result or a numerical limit or standard. He claimed to have discovered a phenomenon of nature, that X-radiation in excess of 0.04 mr/hr from televisions is harmful to human health[6] and applied for a patent to privatize the benefits that would flow from his teaching. Such a monopoly on ideas is unavailable under the patent laws.

■ Even if one were to construe the patent as one for a "safe color television tube," as Sheldon suggests, the patent would fail for lack of novelty. The sole departure from the standard X-radiation protection ordinarily found in color televisions that Sheldon claims is a substantially lead-free "X-ray absorbing means . . . provided by an oxide of alkali earth metal, in which said X-ray absorbing means comprise more than 10% of said oxide and less than 20% of said oxide and in which said face plate has X-ray absorbing power higher than the equivalent X-ray absorbing power of 0.190 mm. of lead." '073 patent, Claim 15. The evidence demonstrated that there was nothing novel in the use of oxides of alkali earth metals, such as barium oxide, as radiation sponges for television tube glass and that glass made according to formulae disclosed in two prior art patents met the radiation absorption requirements. *See* United States Patent No. 2,527,693 ("Armistead patent"), Exh. 27(N); British Patent No. 994,118 ("British patent"), Exh. 45(N). With all the other parts of the tube concededly known, and the one assertedly novel

5. In this Circuit, the presumption of validity carries no independent weight and means only that reasonable doubts will be resolved in favor of the patent holder. *E.g., Reeves Bros., Inc. v. U.S. Laminating Corp.,* 417 F.2d 869, 872 (2d Cir. 1969); *Lorenz v. F. W. Woolworth Co.,* 305 F.2d 102, 105 (2d Cir. 1962).

6. NEG and Asahi dispute Sheldon's claim that he discovered this "phenomenon" and introduced what they considered were publications alerting the scientific community to this danger before Sheldon entered the field. The anticipatory effect of these publications was challenged by Sheldon and is not necessary to support the court's conclusion of invalidity.

component equally well known, Sheldon's patents are devoid of a patentable apparatus. The only novel aspect that he could claim (and even the originality of this observation is disputed by NEG and Asahi, see note 6, *supra*) is the idea that a certain level of protection is necessary or desirable; an idea that is unpatentable regardless of novelty or significance. Accordingly, the patents are invalid under § 101 because of lack of patentable subject matter and lack of novelty.

NEG and Asahi argued that in addition to the patents' failings under § 101, they are also deficient under 35 U.S.C. § 103 (1976). Section 103 was added to the patent laws as explicit statutory approval of decisions denying or invalidating patents under § 101 because of the obviousness of the subject matter. *See* 66 Stat. 798 (1952) (reviser's note to § 1). As such, declarations of invalidity under § 103 amplify findings made under § 101. Application of § 103 requires a three step review:

> the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved.

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966).

The evidence included several pieces of relevant prior art. Most pertinent were the British patent and the Armistead patent that disclosed glass composition for television picture tubes. An additional piece of art is the publication of an article in the periodical Science Magazine, October, 1959, issue, Exh. 58(N), that discloses that television picture tubes operating at high voltages generate X-radiation. Finally, although there was no formal submission of prior art concerning the non-glass components of the television picture tube, for example, the electron beam producing element or the perforated grid, Dr. Sheldon readily admitted that those elements of his patent do not differ from prior art.

The plaintiffs introduced evidence of additional preemptive prior art in the form of sales of Zenith television sets that purportedly emitted no significant X-radiation and thus would have satisfied, long before Sheldon applied for the patent, the radiation limitation that Sheldon claims is the crux of his patent. The court did not rely on this evidence in reaching its decision, however, because questions were raised about the adequacy of the tests performed on the Zenith sets that could have caused reasonably minded jurors to discount the tests' significance.

The second step of the *John Deere* inquiry requires comparison of the prior art with the claims at issue to ascertain their differences. No difference between the collective teaching of the prior art and Sheldon's patents is readily apparent. As discussed above, Sheldon himself does not claim any novelty in his set design other than its ability to restrict X-radiation through the face plate to .04 mr/hr, measured at 5 cm. NEG and Asahi contend that the Science Magazine article contains that same prescription and that the Armistead patent and British patent teach how to make glass that would provide the necessary protection. Although the court is of the opinion that Sheldon did not raise any real question concerning the plaintiffs' demonstration of the complete preemption by prior art, Sheldon's patents would still fall even if the jury accepted his claim that the radiation emission standard set his tubes apart from the prior art. The court will thus proceed to determine obviousness accepting, *arguendo*, the claim that the limitation standard was novel.

The third requirement established by the *John Deere* rule is determination of the "level of ordinary skill in the pertinent art." 383 U.S. at 18. The only evidence on this question was presented by Asahi's witness, Carl Braestrap, who authored the Science Magazine article and who has spent his career studying radiation detection and protection. Tr. 382–90. Braestrap testified that the educational background of persons who determine what radiation protection there should be in television receivers would include a college education in physics or engineering followed by five to ten years experience in actually taking measurements. Tr. 397.

Braestrap's observation is only of limited use, however, because at issue is not what would be an appropriate level of radiation protection, a figure that a detection and protection specialist might be qualified to answer, but, given the desire to limit emissions to .04 mr/hr, what would be an appropriate design for the television tube.[7] From this perspective, the pertinent level of skill is that of a glass technologist familiar with methods of controlling radiation through glass.[8]

Sheldon as much as conceded on the witness stand that his invention was obvious to any skilled practitioner of the art. When pressed to describe, with particularity, his invention and how it satisfied the specificity requirements of 35 U.S.C. § 112 (1976), Sheldon stated that the glass composition was not his invention; his invention consisted of the instruction of how much protection to provide. He discovered "what is necessary to do," meaning how much X-radiation it was necessary to absorb. Tr. 674. Armed with that information, "any glass technologist can make it [the protective glass]." *Id.* The problem that Sheldon solved was not how to produce the glass, but what to produce.

The obviousness inquiry thus returns us to the patentable subject matter inquiry, only with the issue viewed from a different perspective. The conclusion, under the § 101 review, was that Sheldon's patents were invalid either because they failed the novelty test, or because the only arguable original feature was an unpatentable prescription for a desirable degree of safety. Under § 103 it is clear that the patent is invalid because either it is mere recasting of the prior art, or the only plausible bit of novelty, the making of glass to conform to the prescribed radiation absorption qualities, would be obvious to a person of ordinary skill in the art once that person was instructed on the desirability of making glass with those absorption characteristics. As other would-be, but ultimately unsuccessful, inventors before him, Sheldon has patented a claim that is a mere improvement in safety features previously incorporated into the art. It is a " 'change only in form, proportion or degree. . . . doing substantially the same thing in the same way by substantially the same means with better results [, but this] is not such invention as will sustain a patent.' " *Pullman, Incorporated v. ACF Industries, Incorporated*, 393 F.2d 83, 89 (2d Cir. 1968) (*quoting Eibel Process Company v. Minnesota & Ontario Paper Co.*, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923)).

IT IS SO ORDERED.

---

7. The inquiry must point in this direction because the patent protects technical achievement, not ideas. *See, e.g., Lemelson v. Topper Corporation*, 450 F.2d 845, 848 (2d Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1253, 31 L.Ed.2d 456 (1972); *Janex Corporation v. Bradley Time*, 460 F.Supp. 383, 387–88 (S.D.N.Y. 1978) (Frankel, J.).

8. A formal finding of the level of skill that a person reasonably adept in the art would possess is not an absolute prerequisite to ruling a patent void for obviousness. *See Pullman, Incorporated v. ACF Industries, Incorporated*, 393 F.2d 83, 86 (2d Cir. 1968). In *Pullman*, the Court of Appeals rejected the argument that the district court's reliance on a general conclusion that a "hypothetical mechanic" would possess such knowledge as to render the patented device obvious was misplaced and that a specific finding of reasonable skill was necessary.