**RAILROAD DYNAMICS, INC., Plaintiff,**

v.

**A. STUCKI COMPANY, Defendant.**

**Civ. A. No. 76–800.**

United States District Court,
E.D. Pennsylvania.

March 25, 1983.

354

Ronald L. Panitch, Alan S. Nadel, Philadelphia, Pa., for plaintiff.

Raymond G. Hasley, Rose, Schmidt, Dixon & Hasley, Pittsburgh, Pa., for defendant.

## MEMORANDUM

RAYMOND J. BRODERICK, District Judge.

This is a declaratory judgment action instituted by plaintiff Railroad Dynamics, Inc. ("RDI") against A. Stucki Company ("Stucki") seeking a declaration that United States Patent Number 3,837,292 (hereinafter "the '292 patent" or the "patent in suit") is invalid. This Court has jurisdiction over the action under 28 U.S.C. §§ 2201 and 2202 and 28 U.S.C. § 1338(a).[1] Stucki, the owner of the patent as assignee of the inventor, Donald Wiebe, counterclaimed against RDI alleging that the patent was valid and infringed by RDI. RDI has admitted that if the patent is found to be valid, RDI has infringed the patent.

Following a fifteen day trial a jury, in its answers to eleven special interrogatories, found for defendant on all validity issues submitted. The damages portion of the case was then tried to the Court, and judgment was entered on August 26, 1981 in favor of Stucki and against RDI in the amount of $1,960,700.

Plaintiff has moved for judgment notwithstanding the verdict, or, in the alternative, for a new trial, contending that the evidence was insufficient to support the jury's findings and that, as a matter of law, the '292 patent is invalid. RDI contends, as it contended at trial, that the patent is invalid for four reasons: 1) the invention claimed was obvious in view of the prior

---

**1.** At the time this case was tried, appeals from a district court in cases arising under 28 U.S.C. § 1338 were heard in the regional courts of appeals and thus an appeal from a decision of this Court would have been heard by the Third Circuit. Jurisdiction of appeals in which the jurisdiction of the district court was based in whole or in part on § 1338 is now vested exclusively in the United States Court of Appeals for the Federal Circuit, 28 U.S.C. § 1295(a)(1); 28 U.S.C. § 171, note (West Supp. June, 1982).

Since this Court and the parties have made extensive reference to cases from other Circuits at both the trial and the post-trial stages of this proceeding, and since the relevant law of the Third Circuit appears to be in harmony with the law of other Circuits, and with that of the former Court of Customs and Patent Appeals, we have not considered this change to require any further proceedings or any additions to the already extensive briefing by the parties of the legal issues in this case.

art at the time of invention, and hence was unpatentable under 35 U.S.C. § 103; 2) the patent fails to disclose the best mode of installing and retaining the patented device, rendering the patent invalid under 35 U.S.C. § 112; 3) the claims in the patent were filed more than one year after sale and use of the claimed invention, rendering the patent invalid under the late claiming doctrine; and 4) no supplemental oath was filed in support of the claims which ultimately became the claims of the patent, a violation of 37 C.F.R. § 1.67 which renders the patent invalid. RDI further contends that even if the patent is valid, it has intervening rights under 35 U.S.C. § 252 to continue to make and sell its infringing device because Stucki added the claims which cover RDI's device only after seeing RDI's device in use. Finally, RDI submits that this Court erred in its charge to the jury, making a new trial necessary if judgment notwithstanding the verdict is not granted. For the reasons which follow, we reject all of plaintiff's contentions, and we will deny its motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

The standards by which a court must decide motions for a new trial and for judgment notwithstanding the verdict have been set forth by this Court as follows:

[1, 2] Motions for a new trial require the exercise of discretion by the Court, whose "duty is essentially to see that there is no miscarriage of justice." 6A *Moore's Federal Practice* ¶ 59.08[5], at 59–160 (footnote omitted) (2d ed. 1974); *Thomas v. E.J. Korvette, Inc.*, 476 F.2d 471, 474–75 (3d Cir.1973). The jury's verdict may be set aside only if manifest injustice will result if it were allowed to stand. The Court may not substitute its own judgment for that of the jury merely

because the Court may have reached a different conclusion. To grant a motion for judgment n.o.v., the Court must find as a matter of law that the plaintiff failed to adduce sufficient facts to justify the verdict. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205, 1210 (3d Cir.), *cert. denied*, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Such a motion "may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A *Moore's supra*, ¶ 50.07[2], at 50–77 (footnote omitted); *Korvette, supra*, at 474.

*Douglas W. Randall, Inc. v. AFA Protective Systems*, 516 F.Supp. 1122, 1126 (E.D. Pa.1981), *aff'd*, 688 F.2d 820 (3d Cir.1982).

■ These standards are applicable to patent cases. Although the question of patent validity, including the determination of the obviousness or non-obviousness of the subject matter of a patent is ultimately a legal one, the determination depends on underlying questions of fact. *Northern Plastics Engineering Co. v. Eddy*, 652 F.2d 333, 336 (3d Cir.1981); *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d 1047, 1060 (4th Cir.) *cert. denied sub nom., Kayser-Roth Corp. v. Tights, Inc.*, 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976); *Stevenson v. International Trade Commission*, 612 F.2d 546, 549, 67 C.C.P.A. 109 (1979).[2] Where, as here, the jury has found a patent to be non-obvious, and has made other findings which support the validity of the patent, these findings are determinations that the disputed factual questions with respect to the issues of obviousness and validity have been resolved favorably to the patentee. *Dual Manufacturing & Engineering, Inc. v. Burris Industries, Inc.*, 619

---

**2.** Plaintiff contends, now as at trial, that since the question of obviousness is ultimately one of law, it is error to submit the issue in an interrogatory to the jury for its determination, as was done in the trial of this case. This contention has been consistently rejected. *Tights, Inc.*, 547 F.2d at 1061; *Control Components, Inc. v. Valtek, Inc.*, 609 F.2d 763, 766–67 (5th Cir.1980) *cert. denied*, 449 U.S. 1022, 101 S.Ct. 589, 66

L.Ed.2d 484; *Velo-Bind, Inc. v. Minnesota Mining & Manufacturing Co.*, 647 F.2d 965, 971 (9th Cir.) *cert. denied*, 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Panther Pumps & Equipment Co., Inc. v. Hydrocraft, Inc.*, 468 F.2d 225, 228 (7th Cir.1972) *cert. denied*, 411 U.S. 965, 93 S.Ct. 2143, 36 L.Ed.2d 685. *See E.I. DuPont de Nemours & Co. v. Berkley & Co., Inc.* 620 F.2d 1247, 1261 (8th Cir.1980).

F.2d 660, 664 (7th Cir.) (*en banc*) *cert. denied,* 449 U.S. 870, 101 S.Ct. 208, 66 L.Ed.2d 90 (1980). The jury's factual findings may not be overturned if supported by sufficient evidence, viewing the record in the light most favorable to the verdict winner, and giving the verdict winner the benefit of all reasonable inferences. *Black and Decker Manufacturing Co. v. Sears, Roebuck & Co.,* 679 F.2d 1101, 1103 (4th Cir. 1982); *Velo-Bind, Inc. v. Minnesota Mining & Manufacturing Co.,* 647 F.2d 965, 971 (9th Cir.) *cert. denied,* 454 U.S. 1093, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981).

Much of the background to this case was set forth in this Court's memorandum of August 25, 1981 on the damages issues, and can be summarized as follows:

The patent in suit concerns the spaced placement of a hydraulic shock absorber or "snubber" in the spring group of a railroad freight car, between the bolster and the side frame, held in place by a biasing spring so that it is normally operative only when the car is loaded and is normally inoperative when the car is unloaded.[3] A freight car has four side frames, each of which holds two of the car's eight wheels. A freight car also has two bolsters. A bolster is a metal rod which connects the two side frames at each end of the freight car. The spring group is a group of springs, usually eight to ten in number, located between the wheels in each side

frame. Each end of a bolster is attached to and rests upon the springs in the spring group of a side frame. An illustration of the shock absorber in the patented location is given in Figure 1.[4]

The springs in the spring group operate in the same manner as springs in an automobile and absorb energy when the freight car is in motion. The energy absorption capacity of the springs is not sufficient, however, to control the movement of many large freight cars, particularly when such cars are being operated at higher speeds or on railroad track that is in poor condition. In such circumstances, these large freight cars begin to rock from side to side, a phenomenon known in the railroad industry as "rock and roll". Primarily on curved track, the rock and roll motion of a freight car can become so severe that the freight car body can be lifted off the center plate upon which it rests, and one or more wheels can actually be lifted off of the track for a fraction of a second. If the wheel does not return to the track, a derailment occurs. Though this problem previously existed in the industry it became particularly acute when 100-ton capacity freight cars, 25–30% larger than previously existing cars, were introduced around 1964. (N.T. 3.109)

In order to prevent derailments due to "rock and roll", the railroad industry developed shock absorbers, or "snubbers", de-

**3.** Claim 1 of the patent in suit sets forth the invention as follows:

1. In a dampened railway truck assembly selectively operable in loaded and unloaded conditions and having a hydraulic snubber apparatus interposed in a spring group intermediate a bolster member and a side frame member, the improvement comprising: means interposed between said snubber apparatus and one of said members to bias said snubber apparatus towards the other of said members; said means being operative to bias said snubber apparatus out of operative engagement with said one of said members when said truck assembly is normally operating in an unloaded condition; and said means and said snubber apparatus being cooperable to initiate hydraulic snubbing by said snubber apparatus substantially only when said railway truck assembly is normally operating in a loaded condition, the bias of said means is

partially overcome and said snubber apparatus is in operative engagement with both of said members.

**4.** In Figure 1, the shock absorber is indicated by Number 132, the bolster by 118, and the side frame by 121. 22 and 23 indicate springs within the spring group.

FIG. 1

signed to provide added energy absorption capacity to that already supplied by the springs in the spring group. A number of companies developed friction snubbers, designed to dissipate rock and roll energy in the form of heat by bringing two pieces of metal together while the freight car was in motion. In the mid to late 1960's RDI and Stucki manufactured hydraulic snubbers that absorbed excess energy by use of the principles of hydraulics. No snubber completely absorbs all of the energy created by the rock and roll motion of a freight car, but it is claimed that hydraulic snubbers absorb a greater amount of energy than friction snubbers. Only RDI and Stucki manufactured hydraulic snubbers which were accepted in the trade in the late 1960's.

The Stucki hydraulic snubber based on the patent in suit, known as the "HS-6" snubber, is located in the spring group and designed so that it does not become engaged, or begin to absorb energy, until a freight car is loaded with freight. The HS-6 is installed in a spring group by removing one of the outboard springs of the group and replacing it with the HS-6 unit. Since the HS-6 unit is not as long as the distance between the bolster and the side frame, the unit makes use of a "biasing" spring located between the side frame and the snubber which holds the snubber in place and away from the side frame when the freight car is empty. The snubber is pressed into contact with the side frame when the car is loaded and, once pressed into contact, can begin to absorb energy.

The patent in suit, number 3,837,292, was issued to Donald Wiebe on September 24, 1974. It was based on an application [PX–3] filed April 15, 1971. This application was a continuation-in-part of application number 857,274, filed August 22, 1969 [PX–6] ("the parent application"), which was itself a continuation-in-part of application number 709,142, filed February 28, 1968 and later abandoned [PX–7] ("the grandfather application"). Figures 9–12 of the parent application, along with related specifications, were transferred without change to the patent in suit, becoming figures 5–8 of the patent in suit. The remainder of the parent application matured as United States Patent Number 3,595,350, issued to Donald Wiebe on July 27, 1971.

Plaintiff RDI has also marketed an hydraulic snubber placed in the spring group, spaced so that it is engaged only when the freight car is loaded. This snubber is known as the "Control Master" (C/M) snubber. The C/M snubber was designed and built by RDI's president, Stuart Schwam, in three weeks in the fall of 1971. (N.T. 2.38). The C/M snubber is located in the spring group in place of the center spring of the group, and is attached to the side frame and spaced from the bolster by a spring lodged between the top of the snubber and the bolster. RDI has admitted that this device infringes the patent in suit should the patent in suit be found to be valid.

*Presumption of Validity*

Any analysis of patent validity must begin "with the recognition that a patent is presumed to be valid, and that the burden of establishing invalidity rests on the party asserting it." *Tokyo Shibaura Electric Co., Ltd. v. Zenith Radio Corp.,* 548 F.2d 88, 93 (3d Cir.1977). This presumption requires invalidity to be demonstrated by strong, clear and convincing proof. *Id. Aluminum Company of America v. Amerola Products Corp.,* 552 F.2d 1020, 1024 (3d Cir.1977); *Moon v. Cabot Shop, Inc.,* 270 F.2d 539, 541 (9th Cir. 1959); *See* P. Rosenberg, Patent Law Fundamentals § 17.05, at 17–27. Moreover, this presumption applies not only to the determination of non-obviousness necessarily implicit in the grant of a patent, but also to those other matters considered by the Patent Office, such as the adequacy of disclosure, and the allowability of additional claims. *Trio Process Corporation v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 74 (3d Cir.), *cert. denied,* 409 U.S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972); *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 133–34, (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573,

66 L.Ed.2d 473 (1980), citing *Triax Co. v. Hartman Metal Fabricators, Inc.*, 479 F.2d 951, 956–57 (2d Cir.), *cert. denied*, 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973); *Baldwin-Lima-Hamilton Corp. v. Tatnall Measuring Systems*, 169 F.Supp. 1, 21 (E.D.Pa.1958), *aff'd*, 268 F.2d 395 (3d Cir.), *cert. denied*, 361 U.S. 894, 80 S.Ct. 198, 4 L.Ed.2d 151 (1959). With respect to the determination of non-obviousness the presumption is weakened when relevant prior art has not been considered by the Patent Examiner. *Aluminum Corp. of America v. Amerola Products Corp.*, 552 F.2d at 1024. In such a case, "the degree by which the presumption is weakened depends upon a balancing of the pertinence of the newly cited art against the pertinence of the art actually considered by the Patent Office." *Id.* Even should the presumption of validity be weakened, however, it does not shift the burden of persuasion, which "is and always remains upon the party asserting invalidity, as required by 35 U.S.C. § 282." *Stevenson*, 612 F.2d at 551.

■ Several courts have held that the examiner's search record provides prima facie evidence that he searched all the references in the classes and subclasses noted on the file wrapper as having been searched. References in such subclasses left uncited are presumed to have been regarded by the examiner as less relevant than those cited. *Panduit Corp. v. Burndy Corp.*, 517 F.2d 535, 538 n. 2 (7th Cir.) *cert. denied*, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975); *E.I. du Pont de Nemours & Co. v. Berkley & Co., Inc.*, 620 F.2d at 1267. "A contrary view would destroy the presumption of administrative regularity on which the presumption of validity rests." 620 F.2d at 1267.

Plaintiff contends that the Court was in error in instructing the jury that plaintiff must prove its contentions concerning the invalidity of the patent, which were, of course, contrary to the determinations of the Patent Office, by clear and convincing evidence. Plaintiff's allegation of error is untenable in light of the presumption of validity as discussed in the cases cited above. Plaintiff further contends that the court erred in charging that the plaintiff had the burden of proving obviousness by clear and convincing evidence and that plaintiff's burden should instead have been a preponderance burden, since the evidence showed that relevant prior art had not been considered by the examiner. Specifically, plaintiff relies on four references in the prior art which, plaintiff contends, taken together, render defendant's claimed invention obvious. These references are (1) United States Patent Number 1,983,088, issued December 4, 1934 to W.F. Kiesel [PX–27] ("the Kiesel patent"); (2) United States Patent Number 1,989,433, issued January 29, 1935 to T.H. Symington [PX–60] ("the Symington patent"); (3) a description of an hydraulic shock absorber manufactured by the Monroe Auto Equipment Company, designed to replace one spring in each spring group, which description appeared in the March 3, 1945 issue of Railway Age at page 421, [PX–68] ("the Monroe snubber"); and (4) a spring group arrangement manufactured and sold by the Holland company, in which two "E–2" Holland volute springs, which operated as friction snubbers, were used with eight "D–5" springs.[5] This arrangement (hereinafter "the Holland snubber") is illustrated in a drawing dated February 8, 1966, reproduced as Figure 2 [PX–78]. An "adapter spring" was used in this arrangement to prevent the Holland snubber from falling out of the spring nest.

**5.** The E–2 volute snubber has a "free height", or uncompressed height, of approximately 9⅛", and a solid or fully compressed height of 6⁹⁄₁₆". Thus, its "travel" is 2½". The D–5 spring has a free height of about 10¼" and a solid height of 6⁹⁄₁₆". Thus, its "travel" is 3¹¹⁄₁₆". The E–2 volute snubber was later known as a D–3 volute snubber, the change in terminology being necessary for consistency with the standard dimensions and terminology of the American Association of Railroads (AAR). (N.T. 2.63, 2.101, 8.91).

362

FIGURE 2

The question of whether the patents cited by RDI were more pertinent to the determination of obviousness than the prior art cited by the Examiner was properly one for the jury. *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d at 1047; *Aluminum Corporation of America v. Amerola Products Corp.*, 552 F.2d at 1025 n. 8. The jury in this case was properly instructed, in accordance with the *Alcoa* and *du Pont* cases cited above, as to the standards for making this determination and as to the effect on the presumption of validity of a determination that more relevant prior art had not been cited (N.T. 14.122–23). There

is no basis for plaintiff's allegation of error.

Moreover, we find that there was sufficient evidence in the record for the jury to have determined that the presumption of validity was not weakened in this case because the material considered by the Patent Office effectively incorporated the significant prior art. *See Northern Plastics v. Eddy*, 652 F.2d at 338–39 n. 13. The Kiesel patent and the Symington patent are both classified in subclasses cited by the Examiner. The Monroe snubber's teaching of placement of a hydraulic snubber in a spring group is substantially the teaching of United States Patent Number 3,464,366 granted to O.E. Seay on September 2, 1969 ("the Seay patent"). The Seay patent was cited by the Examiner. The teaching of the Holland snubber was a hotly contested issue at trial, and the jury could well have concluded that it taught no more than the art cited by the Examiner. The evidence showed, for example, that the Seay patent cited by the Examiner included a return spring which was similar in function to the adapter spring in the Holland arrangement (N.T. 12.5, 12.88).[6] Finally, our own evaluation of the evidence adduced on the question of obviousness, discussed below, leads to the conclusion that it does not support a finding of obviousness even by a preponderance of the evidence.

OBVIOUSNESS

35 U.S.C. § 103 provides that a patent may not be obtained if the claimed invention would have been obvious to a person of ordinary skill in the art to which the subject matter of the invention pertains.[7] The standards for evaluating obvi-

---

6. Since the statutory presumption of validity is "heightened by a showing that the prior art was adequately considered," *Shackelton v. J. Kaufman Iron Works, Inc.*, 689 F.2d 334, 339 n. 3 (2d Cir.1982), the instruction given may in fact have been less generous to the defendant than that to which it was entitled.

7. 35 U.S.C. § 103 reads as follows:

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would

ousness were set forth by the Supreme Court in *Graham v. John Deere Co.*, 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966), as follows:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness of non-obviousness, these inquiries may have relevancy.

Under the holdings of the Third Circuit and at least four other circuits, combination patents, i.e., patents on inventions which combine known elements, are analyzed in light of the factors set forth in *Graham*, and not held to any higher standard of nonobviousness. *Rengo Company, Ltd. v. Molins Machine Co., Ltd.*, 657 F.2d 535, 544 & n. 18 (3d Cir.1981), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 591 (1981); *Plastic Container Corp. v. Continental Plastics*, 607 F.2d 885, 904–05 (10th Cir.1979); *Champion Spark Plug Co. v. Gyromat Corp.*, 603 F.2d 361, 372 (2d Cir. 1979); *Republic Indus., Inc. v. Schlage Lock Co.*, 592 F.2d 963, 967–72 (7th Cir. 1979); *Nickola v. Peterson*, 580 F.2d 898, 912 n. 22 (6th Cir.1978). *See*, L. Pretty, A Forecast of CAFC Holdings on Issues Unsettled in the Circuits Based on CCPA Precedents, 10 APLA Journal 270, 271–72 (1982) (predicting that the Federal Circuit will reject "synergy" as a requirement for patentability of combination patents).

Our primary inquiry under *Graham* concerns (1) the scope and content of the pertinent prior art; (2) the difference between the prior art and the claims at issue; and (3) the level of ordinary skill in the pertinent art. We have set forth above the references in the prior art upon which plaintiff has placed its primary reliance in seeking a declaration of the invalidity of the patent in suit. The testimony at trial showed that the relevant level of skill was at least that possessed by an "ordinary engineer" with knowledge of mechanical design principles and vibration theory equivalent to that of a college graduate, and with some experience in the railroad industry. (N.T. 2.49, 3.36, 3.72, 4.102) The relevant level of skill is that possessed by a designer, not a user, of the railroad suspension devices here in issue. *In re Nalbandian*, 661 F.2d 1214, 1216 (C.C.P.A.1981) (citing similar holdings from the Second, Third, Tenth and District of Columbia Circuits).

The testimony at trial showed several significant differences between the prior art relied upon by the plaintiffs in seeking to invalidate the patent due to obviousness and the subject matter of the patent in suit, and established that the prior art did not embody the primary advantages of the patent in suit.

Of the prior art devices cited, only the Holland snubber included a spring in a location between the snubbing device and the bolster or side frame. Testimony at trial showed that the Holland "adapter spring" was designed to, and operated to, retain the snubber in the spring group, and not to keep the snubber out of operative engagement with the bolster in light loads.[8]

---

have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

8. Testimony at trial also showed that a spring on the Monroe snubber had a similar purpose. (N.T. 11.142). The Monroe snubber was designed to be in constant contact with the bolster and side frame.

(N.T. 12.74, 12.19–20). The biasing spring of the patent in suit was designed, and operated, however, to accommodate all of the complex motions associated with the "rock and roll" of a freight car, lateral as well as axial. (N.T. 11.142–43, 12.19–21, 12.71–72). There was a great deal of testimony concerning the tendency of the Holland snubber to "trap" or become stuck in a compressed position (N.T. 2.151–52, 3.175–76). Under these circumstances a method for retaining the Holland snubber in the spring group and for urging its reextension into its normal operating position was necessary. This was the function primarily performed by the Holland adapter spring (N.T. 2.156, 3.117, 175, 11.-142).

There was also testimony showing that the Holland arrangement did not maintain a constant and uniform spacing of the snubber from the bolster. Testimony was given showing that the Holland device, in normal operating conditions, was in constant contact with the bolster member, so much so that the top of the volute coil actually "Brinelled", or wore grooves, of as much as a quarter of an inch into the bottom of the bolster. (N.T. 2.166–67, 11.-140). The Holland spring did not make contact with the top of the volute coil in order to prevent this undesirable effect. Instead, it was connected to the bushing around a nut in the interior of the snubber device (N.T. 3.181, 9.11–12). While this placement may have aided in the reextension of a "trapped" snubber, it did not maintain the snubber out of operative engagement with the bolster.

The biasing spring of the patent in suit, by contrast, does respond to lateral as well as axial movement, enabling the device to achieve its goal of maintaining the snubber out of operative engagement with the bolster or side frame in light loads. Moreover, this biasing spring is able to maintain a more uniform spacing between the snubber and the bolster or side frame. The problems of "trapping" and of "Brinelling", with the resultant wear on the bolster or side frame, are thus largely overcome.

Both the Kiesel patent and the Symington patent, while indicating the desirability of spacing between a snubber and a side frame or bolster under light load conditions, did not provide effective means to accomplish this goal, as did the patent in suit. There was, in fact, testimony at trial that neither snubber would have been able to function in order to achieve the results each claimed or sought. (N.T. 9.39, 11.124, 129–30). In addition, the Kiesel and Symington devices were designed for use on cars with "plain" side bearing journals, rather than on cars with "roller" side bearing journals. (N.T. 8.75–76, 9.35–36). Neither device was, therefore, designed to control nor, according to the testimony, could have effectively controlled, the greater degree of lateral movement, allowed in the more modern "roller" journal cars, which lateral movement was considered to be a factor in creating "rock and roll". (N.T. 9.35, 41, 44–45, 11.123–24). All of these differences between the prior art and the patent in suit show that the patented device represented a significant advance in the attempts of the designers of railroad suspension equipment to control the "rock and roll" problem, and did not merely apply "knowledge clearly present in the prior art." Cf. In re Sheckler, 438 F.2d 999, 1001, 58 C.C.P.A. 936 (1971).

As stated above, the fact that a claimed invention combines elements known in the prior art does not mean that in determining obviousness we should hold it to a standard different from that which Graham mandates.

Of course, virtually all mechanical inventions are new combinations of old elements. The pertinent question is not whether each element was known or obvious, but whether, considering the invention as a whole, it would have been obvious to combine the elements in the claimed relationship, and a court may look to such evidence of unobviousness as new and advantageous results achieved by the claimed invention, industry acceptance, commercial success, and copying by others.

*Square Liner 360°, Inc. v. Chisum,* 691 F.2d 362, 369 (8th Cir.1982) (citations omitted). The elements of the claimed invention in the '292 patent had never previously been combined in the manner set forth in the patent. The biasing spring in particular performs a function substantially different from that of previous springs used in snubber devices, resulting in advantages in the efficiency and performance of the snubber. As a result, the device is non-obvious and patentable. *See Trio Process Corp. v. L. Goldstein's Sons, Inc.,* 461 F.2d 66, 73 (3d Cir.1972).

■■■■■ Patentability is not defeated because the claimed invention is embodied in a snubber which serves the same purpose as did previous snubbers. *Jamesbury Corp. v. Litton Industrial Products, Inc.,* 586 F.2d 917, 922 (2d Cir.1978). Invention is exhibited in the cooperation of the elements of the patented device in a new and useful way to accomplish an improved result, enhancing its usefulness, *Id. See Williams Manufacturing Co. v. United Shoe Machinery Corp.,* 316 U.S. 364, 368, 62 S.Ct. 1179, 1181, 86 L.Ed. 1537 (1942). As the former Court of Customs and Patent Appeals noted "patents are and should be granted to later inventors upon unobvious improvements. Indeed, encouragement of improvements on prior inventions is a major contribution of the patent system and the vast majority of patents are issued on improvements." *In re Hogan,* 559 F.2d 595, 606 (C.C.P.A.1977).

■■■■■ Plaintiffs have argued vigorously that the ineffectiveness of prior art devices, or even their unworkability, does not preclude their consideration as relevant prior art which renders the claimed invention obvious. While unworkable devices can be considered as part of the prior art, their practical ineffectiveness does provide an indication of the nonobviousness of a successful and workable device. *Ling-Temco-Vought, Inc. v. Kollsman Instrument Corp.,* 372 F.2d 263 (2d Cir.1967); *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 298 F.Supp. 435, 446 (W.D. Mich.1969), *aff'd,* 430 F.2d 221 (6th Cir.

1970), *cert. denied,* 401 U.S. 939, 91 S.Ct. 932, 28 L.Ed.2d 218 (1971). *See Sutter Products Co. v. Pettibone Mulliken Corp.,* 428 F.2d 639, 646–47 (7th Cir.1970); *Azoplate Corporation v. Silverlith, Inc.,* 367 F.Supp. 711, 721–22 (D.Del.1973), *aff'd,* 506 F.2d 1050 (3d Cir.1974), *cert. denied,* 421 U.S. 914, 95 S.Ct. 1572, 43 L.Ed.2d 780 (1975) ("the inherent inoperativeness of the printing plates as disclosed in the French patent and the explicit ineffectiveness of the diazo compounds of Zahn militate against a conclusion of obviousness"). Neither the Kiesel reference nor the Symington reference was ever reduced to practice, and serious doubts were expressed at trial as to whether either would have operated as an effective snubber. Both of these factors reduce the weight to be given to these references in determining obviousness.

It should also be noted that both the Kiesel and the Symington references were over thirty years old at the time of the claimed invention, and designed for cars of different configuration than those having the most severe "rock and roll" problems in the 1960's. This also reduces the degree to which the claimed invention can be considered obvious in view of these references. *See General Battery Corp. v. Gould, Inc.,* 545 F.Supp. 731, 752 (D.Del.1982); *Wilden Pump and Engineering Co. v. Pressed & Welded Products Co.,* 199 U.S.P.Q. 390, 399 (N.D.Cal.1978), *aff'd in part, rev'd in part on other grounds,* 655 F.2d 984 (9th Cir.1981).

■■■■ The determination that the subject matter of the patent in suit was not obvious in light of the relevant prior art is further buttressed by the fact that the prior art as it developed did not lead towards the spaced structure crucial to the claimed invention. During and even after the time of the claimed invention, devices were being developed, and patented, which rejected a spaced configuration. The opinion of most in the industry was, in fact, that a spaced configuration would not be effective in controlling "rock and roll". (N.T. 10.73, 77–78, 12.108–09). Significantly, the Holland

Company, which designed and manufactured the prior art device on which plaintiff most heavily relies in arguing obviousness, developed and sold, in 1965 and 1966, a "D–5" volute snubber, which was designed to maintain constant contact with the bolster and side frame at all times, and did in fact do so. (N.T. 2.124–25, 4.20, 4.41). "When prior art teaches away from the methods used in a patent, it is relevant and persuasive evidence of the nonobviousness of the patented matter." *General Battery Corp. v. Gould, Inc.*, 545 F.Supp. at 753, citing *Tights, Inc. v. Acme-McCrary Corp.*, 541 F.2d at 1059 ("the fact that the defendants' prior art references lead away from [the patent in suit] and that even unusually skilled artisans in the field corroborated the negative teachings, is both relevant and persuasive as to the question of non-obviousness").

The ability of the Holland E–2 snubber arrangement to teach the spaced configuration of the patent in suit was also impaired by the fact that its operative embodiments did not maintain uniform spacing between the snubber and the bolster or side frame, and that, in fact, the Holland E–2 device was consistently in contact with these members. (N.T. 8.152–53, 10.105, 11.136–40, 12.20). One of plaintiff's expert witnesses, in fact, was shown at trial to have submitted a patent application in 1971 in which he averred that "[h]eretofore damping type volute roll absorber[s] of the type shown in [the] patent have been designed with the intention that they maintain contact with the bolster throughout its entire range of movement." (2.147). This further undermines plaintiff's contention that the subject matter of the patent in suit was obvious in light of the Holland arrangement.

*Secondary Considerations As to Obviousness*

The so-called "secondary considerations" with respect to obviousness—commercial success, long-felt but unsolved needs, failure of others, and so forth—are frequently considered by courts in arriving at a conclusion as to the obviousness or non-obviousness of a patent. These considerations are readily susceptible of judicial treatment, and also help to prevent a court from slipping into the use of hindsight, and from improperly reading into the prior art the teachings of the invention in issue. *Graham v. John Deere*, 383 U.S. at 36, 86 S.Ct. at 703. While *Graham* itself indicated that these secondary considerations cannot alone be dispositive on the issue of obviousness, the considerations have considerable value as "real-life indicia" of validity. *Jacobson Brothers, Inc. v. United States*, 184 U.S.P.Q. 181, 185 (Trial Div.1974), aff'd, 185 U.S.P.Q. 168 (Ct.Cl.1975). The recently created Federal Circuit has stated that evidence as to secondary considerations, when properly presented, must always be considered in connection with the determination of obviousness. *In re Sernaker*, No. 82–579, slip op. at 18 (Fed.Cir. February 28, 1983); *See Stevenson v. International Trade Commission*, 612 F.2d at 553; *Shackelton v. J. Kaufman Iron Works, Inc.*, 689 F.2d 334, 340 (2d Cir.1982) (evidence favorable to the patentee on secondary considerations "strongly suggests that the combination created ... was not obvious to others working in the same field").

The evidence at trial showed, without contradiction, that the snubber embodying the claimed invention was commercially successful and accepted by the industry as a desirable, useful and beneficial device. (N.T. 2.55, 2.179). Clearly, the inference that a device of such value would have appeared earlier, were it in fact obvious, is permissible in this case. *See In re Sernaker*, slip. op. at 21 (Davis, J., concurring) (unrebutted evidence of commercial success "decisive" in showing non-obviousness); *Black and Decker Manufacturing Company v. Sears, Roebuck & Co.*, 679 F.2d 1101, 1104 (4th Cir.1982) (tremendous commercial success of patented device makes it "highly unlikely" that the device would have been obvious to a person of ordinary skill in the art when patented). Further, the testimony as to the advantage of the spaced structure with the biasing spring easily supports the inference that the

claimed invention itself was responsible for this success.

■ There was also ample evidence in the record to show that the claimed invention filled a long-felt need in the industry for an efficient, effective and relatively low-cost device capable of controlling the rock and roll movement of large freight cars. The industry had devoted considerable resources in the five years preceding this invention in the attempt to solve the rock and roll problem. (N.T. 4.154, 10.78). Defendant's expert witness, Mr. Tack, who had been employed by one of the defendant's competitors, testified for example, that his employer had spent about a quarter of a million dollars per year over a five to six year period in research efforts to develop a device capable of controlling rock and roll, without developing a successful device. (N.T. 11.146–52). In light of the demonstrated failure of those in the field to obtain a solution to the problem, despite their knowledge of the problem and their strenuous attempts to solve it, it would be most difficult to conclude that the solution embodied in the claimed invention was obvious to those in the field at the time the invention was made. *See Reiner v. I. Leon Co.,* 285 F.2d 501, 504 (2d Cir.1960), *cert. denied,* 366 U.S. 929, 81 S.Ct. 1649, 6 L.Ed.2d 388 (1961). This invention was clearly not one of those which "do not cost much in time or other resources to make because existing products or processes embody most of the information that constitutes the invention", and which hence may not justify the grant of a patent monopoly. *Cf. Roberts v. Sears, Roebuck and Company,* 697 F.2d 796, 797 (7th Cir.1983). Most of the devices which those in the industry developed to control the rock and roll problem, including those of the plaintiff's president, were eventually patented, and the amount of inventive activity within this industry could well have been spurred by the prospect of patent protection for the device that would ultimately prove successful in controlling the problem. A failure to uphold the validity of a patent obtained under such circumstances could discourage the future commitment of resources to inventive activities.

■ Evidence that an infringing device was copied from the patented device may also provide evidence of the non-obviousness of the patented device. *Square Liner 360° v. Chisum,* 691 F.2d at 369. In the present case there was evidence supporting an inference that the infringing RDI "Control/Master" snubber had been copied from the patented device. The designer of the infringing device, plaintiff's president, had seen the patented snubber tested in June, 1969, and had the opportunity to observe how it was mounted. (N.T. 2.41). The infringing device was designed in a very short period of time, in late 1971. At about the same time, plaintiff came into possession of two drawings, showing in some detail the configuration of the patented device. [PX–55] (N.T. 11.99–100). Given the substantial amounts of time and money which defendant and other manufacturers had expended in an attempt to find a device which would control the rock and roll problem, the jury could have rejected the testimony of plaintiff's president that, having seen the defendant's snubber arrangement, he was able to design the infringing device in only three weeks without copying the patented device.

■ For all of the above reasons, it is this Court's finding that, had it been sitting in this case without a jury, we would have found that plaintiff failed to produce sufficient evidence to support its contention that the claimed invention would have been obvious to a person of ordinary skill in the relevant art at the time it was made, in light of the pertinent prior art. By the same token, the Court finds that the jury's determination that the plaintiff in this case failed to present sufficient evidence to show that the claimed invention was obvious is supported by the evidence. The jury was asked in interrogatory number 1:

1. Do you find that the plaintiff has proved by clear and convincing evidence that the United States Patent No. 3,837,292 is invalid on the ground of obviousness?

The jury answered no. This Court must reject the motion of the plaintiff to set aside this finding as not supported by the weight of the evidence, and we also deny plaintiff's motion requesting that this Court find, as a matter of law, that the '292 patent is invalid on the ground of obviousness.

*Best Mode*

■ Plaintiff also contends that the patent in suit is invalid under 35 U.S.C. § 112 because it does not disclose that lugs and pins are necessary to hold the snubber in place in the claimed location, although the inventor was aware of the need for such retaining devices. Section 112 provides in pertinent part:

The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

As the statute makes clear, the "best mode" which must be disclosed is the best mode known to the inventor. *Trio Process Corp. v. L. Goldstein's Sons*, 461 F.2d at 74. In the present case, the inventor testified that he considered the representation disclosed in the patent to be the "best mode" of carrying out his invention, and that the problem of retaining the snubber within the spring group was best dealt with by redesigning the spring. (N.T. 10.33–37). Crediting this testimony, as we are bound to do in light of the jury's finding, we find that it alone adequately supports the jury's conclusion that the patent was not invalid for failure to disclose the "best mode".

■ Even assuming that the use of retaining pins did constitute a superior means of practicing the invention, and that these means were known to the inventor, it does not follow that the failure to disclose these means in this case invalidates the patent. The adequacy of disclosure under § 112 must be evaluated with respect to

persons skilled in the art, and patent specifications will not be required to be so detailed as "production specifications." *Trio Process*, 461 F.2d at 74. The evidence in this case showed that both the problem of non-retention of the snubber and its solution were readily apparent to both designers and users of the device, and that neither required extensive experimentation or inventive effort. As the Supreme Court noted in construing a predecessor to § 112:

If a mechanical engineer invents an improvement on any of the appendages of a steam-engine, he is not obliged, in order to make himself understood, to describe the engine, nor the particular appendage to which the improvement refers, nor its mode of connection with the principal machine. These are already familiar to others skilled in that kind of machinery. He may begin at the point where his invention begins, and describe what he has made that is new, and what it replaces of the old. That which is common and well known is as if it were written out in the patent and delineated in the drawings.

*Loom Co. v. Higgins*, 105 U.S. (15 Otto) 580, 585–86, 26 L.Ed. 1177 (1882). There is no question in this case but that the use of pins and lugs to hold a snubber was well-known; a similar method appears to have been used to insure the retention of Holland E–2 snubbers when used with D–5 springs. (N.T. 2.112–13). Under such circumstances, failure to disclose this method of retention does not violate § 112. *See Rengo Company, Ltd. v. Molins Machine Co.*, 657 F.2d 535, 549–50 (3d Cir.1981), *cert. denied*, 454 U.S. 1055, 102 S.Ct. 600, 70 L.Ed.2d 591 (1981); *Anchor Plastics Company, Inc. v. Dynex Industrial Plastics Corp.*, 363 F.Supp. 582, 602 (D.N.J. 1973), *aff'd*, 492 F.2d 1238 (3d Cir.1974); *In re Sherwood*, 613 F.2d 809, 817, (C.C.P.A. 1980) *cert. denied*, 450 U.S. 994, 101 S.Ct. 1694, 68 L.Ed.2d 193 (1981) ("there would seem to be no cogent reason to require disclosure of the menial tools known to all who practice this art.") Finally, we note that the former Court of Customs and Pat-

ent Appeals recently set forth a standard for testing the adequacy of disclosure under § 112 which focuses, in effect, on the good faith of the inventor in making the disclosure. Under this standard, the evidence, in order to support a best mode rejection, must "tend to show that the *quality* of an applicant's best mode disclosure is so poor as to effectively result in concealment." *In re Sherwood*, 613 F.2d at 816 (emphasis in original). In this case there is no evidence that the retention problem or its solution "was intentionally left out of the patent disclosures". *See General Motors Corp. v. United States International Trade Commission*, 687 F.2d 476, 483 (C.C.P.A.1982). As stated above, the jury appears to have credited the inventor's testimony that he intended to disclose the best mode, and even plaintiff's memorandum in support of its motion for judgment notwithstanding the verdict, at 26, characterizes defendant's alleged failure to disclose the best mode as the result of carelessness, not as the result of concealment. For all of these reasons, we find that the jury's answer of "no" to interrogatory No. 6, which reads:

6. Do you find that plaintiff has proved by clear and convincing evidence that United States Patent No. 3,837,292 is invalid on the ground that the patent application failed to set forth the best mode contemplated by the inventor for carrying out his invention?

was supported more than sufficiently by the evidence, and that the patent in suit is not invalid under 35 U.S.C. § 112 for failure to disclose the best mode.

### Late Claiming, Failure to File A Supplementary Oath, and Intervening Rights

Plaintiff contends, now as at trial, that the filing on April 14, 1972, more than one year after sale of the patented device, of the claims which form the basis for plaintiff's infringement, invalidates the patent under the "late claiming" doctrine, as enunciated in *Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co.*, 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) and *Kahn v. Dynamics Corp. of America*, 508 F.2d 939 (2d Cir.1974), *cert. denied*, 421 U.S. 930, 95 S.Ct. 1657, 44 L.Ed.2d 88 (1975). Plaintiff also contends that the added claims constituted new matter for which a supplemental oath or declaration was required under Rule 67 of the Rules of Practice in Patent Cases, 37 C.F.R. § 1.67.[9] Since no supplemental oath was filed, plaintiffs contend, the patent is invalid. Finally, plaintiff contends that even if the patent is valid, plaintiff acquired intervening rights to continue the manufacture and sale of its infringing device. The jury found that the patent in suit was entitled to an effective filing date of August 22, 1969, and that the patent was not invalid under the "late claiming" doctrine. The jury also found that the patent was not invalid for failure to file a supplemental oath and that plaintiff did not acquire intervening rights to continue the manufacture and sale of the infringing device. The evidence presented at trial was more than sufficient to support these findings.

The claims in the patent in suit which plaintiff has infringed were not a part of

---

**9.** 37 C.F.R. § 1.67 provides:

When an applicant presents a claim for matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented, he shall file a supplemental oath or declaration to the effect that the subject matter of the proposed amendment was part of his invention: That he does not know and does not believe that the same was ever known or used in the United States before his invention or discovery thereof, or patented or described in any printed publication in any country before his invention or discovery thereof, or more than one year before his application, or in

public use or on sale in the United States for more than one year before the date of his application, that said invention has not been patented or made the subject of an inventor's certificate in any foreign country prior to the date of his application in this country on an application filed by himself or his legal representatives or assigns more than twelve months prior to his application in the United States, and has not been abandoned. Such supplemental oath or declaration should accompany and properly identify the proposed amendment, otherwise the proposed amendment may be refused consideration.

the parent application of August 22, 1969 [PX–6], nor were they a part of the application for the patent in suit as originally filed on April 15, 1971 [PX–3]. They were added on April 14, 1972. The original claims, which were directed to the internal construction of the snubber, were transferred to a separate continuation-in-part application and later abandoned. The drawings and specifications of the patent as issued were contained in the parent application and transferred unchanged to the application for the patent in suit; only the claims were changed.

The *Kahn* case does support plaintiff's contention that the "late claiming doctrine" invalidates the claims of the patent in suit. Every other circuit court which has considered this issue, however, including the former Court of Customs and Patent Appeals, has adopted a contrary view of the import of *Muncie Gear,* holding that a "late claiming" argument, properly understood, raises only the question of whether the application, as of its effective filing date, provided adequate support in its *disclosure* for the later-submitted claims. *Westphal v. Fawzi,* 666 F.2d 575, 212 U.S. P.Q. 321 (C.C.P.A.1981); *Faulkner v. Baldwin Piano & Organ Co.,* 561 F.2d 677, 195 U.S.P.Q. 410 (7th Cir.1977), *cert. denied,* 435 U.S. 905, 98 S.Ct. 1450, 55 L.Ed.2d 495 (1978); *Cardinal of Adrian, Inc. v. Peerless Wood Products, Inc.,* 515 F.2d 534, 535, 185 U.S.P.Q. 712 (6th Cir.1975); *Price v. Lake Sales Supply R.M., Inc.,* 510 F.2d 388, 183 U.S.P.Q. 519 (10th Cir.1974); *Locklin v. Switzer Brothers, Inc.,* 299 F.2d 160, 131 U.S.P.Q. 294 (9th Cir.1961), *cert. denied,* 369 U.S. 861, 82 S.Ct. 950, 8 L.Ed.2d 18 (1962); *Chicopee Manufacturing Corp. v. Kendall Co.,* 288 F.2d 719, 129 U.S.P.Q. 90 (4th Cir.), *cert. denied,* 368 U.S. 825, 82 S.Ct. 44, 7 L.Ed.2d 29 (1961). *See Eli Lilly and Co. v. Premo Pharmaceutical Laboratories,* 630 F.2d at 133–34.

■ We adopt this view. The issue of whether the claims as ultimately issued were identical to the claims of the parent application as originally filed is irrelevant under this view of the "late claiming" doctrine. The sole question is whether these claims were supported by an adequate disclosure in the original application. If so, they are entitled to the effective date of the prior application under 35 U.S.C. § 120. *Triax Co. v. Hartman Metal Fabricators, Inc.,* 479 F.2d 951, 957 (2d Cir.1973), *cert. denied,* 414 U.S. 1113, 94 S.Ct. 843, 38 L.Ed.2d 740 (1973).

■ Similarly, the question of whether the added claims constituted new matter for which a supplemental oath was required also depends solely on whether the claims are supported by the disclosure in the original application. *In re Rasmussen,* 650 F.2d 1212 (C.C.P.A.1981). As the Court stated in *Rasmussen,* "Disclosure is that which is taught, not that which is claimed. An applicant is entitled to claims as broad as the prior art and his disclosure will allow." 650 F.2d at 1214. Finally, the fact that a claim "may be broader than the specific embodiment disclosed in a specification is in itself of no moment." 650 F.2d at 1215. The claims, not the drawings, define the scope of the patent, and every conceivable embodiment need not be disclosed in the drawings, *Maxon v. Maxon Construction Co.,* 395 F.2d 330, 334–35 (6th Cir.1968); *see Continental Paper Bag Co. v. Eastern Paper Bag Co.,* 210 U.S. 405, 418–19, 28 S.Ct. 748, 751–52, 52 L.Ed. 1122 (1908).

We find that the evidence in this case shows that the disclosure in the parent application of August, 1969 was adequate to support the claims filed in April, 1972, which became the claims of the patent as issued in August, 1974. First, the illustrations of the claimed invention, Figures 5–8 of the patent in suit, appeared in identical form as Figures 9–12 of the parent application. Figure 8 in particular clearly shows the spacing of the snubber from the side frame, the biasing spring, and its positioning, which form the basis of the claimed invention. As the cases cited above demonstrate, the fact that there is no drawing also showing a snubber spaced from the bolster does not serve to invalidate a claim based on such spacing. As plaintiff's ex-

pert Dr. Paul testified, given the disclosure of spacing from the side frame, the notion of spacing from the bolster is obvious. (N.T. 3.99–3.100). These illustrations thus provide support for the claims later added, and in addition, provide some evidence that these claims concern matter intended to be claimed in the original application. *See Wayne-Gossard Corp. v. Sondra, Inc.,* 434 F.Supp. 1340, 1355 (E.D.Pa.1977) *aff'd,* 579 F.2d 41 (3d Cir.1978).

 There is additional support for the later-added claims in the specifications of the parent application, which were carried forward unchanged into the application for the patent in suit and ultimately into the patent in suit itself. As stated in the specifications:

When the snubber 132 is assembled with the body spring 170 it extends between the side frame bottom member 121 and the bolster bottom surface 168 as seen in FIG. 12. Also as seen in FIG. 12 the top surface 122 of the side frame bottom member 121 will, when the bolster and side frame are assembled but not supporting a car, be at a level indicated by the line A–A relative to the bolster 118. When a car body is placed on the truck of which this side frame 120 and bolster 118 are a part, the relative position of the top surface 122 of the side frame bottom member 121 will be at a position, relative to bolster 118, represented by the horizontal line B–B. This would be the unloaded car position and it is well illustrated that in this position there would be little or no action by the snubber 132 even if the car should bounce somewhat or rock slightly as it was being propelled over the rails. The next horizontal line upward from line B–B namely C–C represents the normal position of the top surface 122, relative to bolster 118, with a loaded car and it is to be seen that at this time the hitherto fully downwardly extended piston rod 154 will be forced upwardly into the cylinder 150 by the slight amount represent-

ed by the height of the line C–C above the downwardmost positioning of the bottom member 164 in FIG 12. The topmost of the horizontal lines namely D–D represents the position of the top surface 122 relative to the bolster 118 when the spring group has been completely collapsed into solid condition.

[PX–6, circle page 22, line 17–23, line 14.] [10] The parent application's specifications also include the following:

The snubber 132 is now ready for normal operation very similar to that described for the spring group snubber of the above copending application or for the embodiment of FIGS 1 through 4 of this application. As hereinbefore mentioned, the limit of extension of the piston rod 154 precludes any action of the snubber 132 with a light car so that true operation of this device begins with a loaded car being moved along a railway and responding to the variations in track height in a well known manner.

[PX–6, circle pages 24, line 24–25, line 4.] These specifications are clearly adequate to support the claims of the patent in suit, which are the use of a biasing spring to maintain the snubber out of operative engagement with the bolster or side frame when a car is unloaded, and to allow initiation of snubbing, in the normal case, only when the car is operating in a loaded condition. Moreover, the inventor testified that at the time the application for the patent in suit was filed, he was aware of other claims that could be made for the disclosed invention, but allowed the application to proceed on the assumption that these claims could be added later. (N.T. 11.15–11.27) The patent in suit is not, therefore, invalid for late claiming, or for failure to file a supplemental oath in support of the later-added claims. We should add that this conclusion is in accordance with the determination necessarily made by the Patent Office in allowing the new claims, and in not requiring the swearing of a supplemental oath. Such actions of the Patent

---

**10.** "Figure 12" as referred to in the disclosure of the parent application corresponds to Figure 8 of the patent in suit. This drawing is Figure 1 of this opinion.

Office are presumptively proper. *Baldwin-Lima Hamilton Corp. v. Tatnall Measuring Systems,* 169 F.Supp. at 21; *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories,* 630 F.2d at 133–34.

Plaintiff has contended throughout these proceedings that even if the patent is valid, as we have determined that it is, the plaintiff acquired intervening rights to continue the manufacture and sale of its infringing snubber because defendant amended its claims after viewing plaintiff's device, and the claims as originally filed were not broad enough to cover plaintiff's infringing device. Testimony was presented by the defendant that, while the inventor had viewed plaintiff's device in operation before the amended claims were filed, the amendments had been conceived earlier, and were later filed in order to assure foreign patent protection. (N.T. 6.130, 6.144, 11.16) Plaintiffs, on the other hand presented contrary testimony in an attempt to show that the amendment was motivated by the defendant's viewing of plaintiff's device. The jury in finding that the doctrine of intervening rights did not apply credited the testimony offered by the defendant. Furthermore, there is a question as to whether the doctrine of intervening rights is applicable to the circumstances presented in this case.

The doctrine of intervening rights in its statutory embodiment appears limited to reissue patents:

> No reissued patent shall abridge or affect the right of any person or his successors in business who made, purchased or used prior to the grant of a reissue anything patented by the reissued patent, to continue the use of, or to sell to others to be used or sold, the specific thing so made, purchased or used, unless the making, using or selling of such thing infringes a valid claim of the reissued patent which was in the

original patent. The court before which such matter is in question may provide for the continued manufacture, use or sale of the thing made, purchased or used as specified, or for the manufacture, use or sale of which substantial preparation was made before the grant of the reissue, and it may also provide for the continued practice of any process patented by the reissue, practiced, or for the practice of which substantial preparation was made, prior to the grant of the reissue, to the extent and under such terms as the court deems equitable for the protection of investments made or business commenced before the grant of the reissue.

35 U.S.C. § 252. Plaintiff contends, however, that the doctrine should be applied to original issue patents in circumstances where, as here, new claims have been added subsequent to initial application in order to cover an infringing device. Support for such a contention may be found in the case of *Kahn v. Dynamics Corp.,* discussed previously. *See* P. Rosenberg, Patent Law Fundamentals, § 7.14 at 7–41. However, as we have heretofore stated, we have joined with those courts which have rejected the *Kahn* rationale. Since it is unquestionably proper for an inventor to add claims to an invention which are adequately supported by the initial disclosure, and since we have found that the disclosure in the original application was sufficient to support the claims which plaintiff contends were added improperly, we do not find a basis for granting plaintiff intervening rights to make and sell the infringing device.[11]

▆▆▆▆ Finally, we note that the doctrine of intervening rights, as § 252 itself indicates, is an equitable doctrine, designed to allow a person who has in good faith manufactured an infringing device, and who has made a substantial investment in

---

11. Plaintiffs also rely on the Third Circuit case of *Galion Iron Works & Mfg. Co. v. Beckwith Machine Co.,* 105 F.2d 941, 941 n. 1 (C.C.P.A. 1939) which states the proposition that enlargements of applications by later-added claims must be strictly construed and cannot interfere

with inventors who have entered the field meanwhile. There is no indication in the *Galion* case, however, that the later-added claims to which the court referred were unsupported by the original disclosure.

such production, to recover these profits. *See Wayne-Gossard Corp. v. Sondra, Inc.,* 434 F.Supp. at 1362–63. It is perhaps for this reason that plaintiff has contended that defendant's actions in filing the later claims were "improper and greedy." Plaintiff's Reply Memorandum in support of its motion for Judgment NOV at 50. As our discussion of the "late claiming" doctrine has made clear, there was nothing improper about defendant's addition of the claims. Furthermore, there is no evidence of substantial preparatory expenditure by the plaintiff which would justify granting it intervening rights in this case. Plaintiff's president testified that he designed and built the infringing device in three weeks, using many components from a snubber already manufactured by the plaintiff. (N.T. 2.38–39) Plaintiff's investment in the development of the product thus appears to have been insubstantial. Further, there is evidence that plaintiff made substantial profits on its sale of the device. *See Railroad Dynamics, Inc. v. A. Stucki Company,* No. 76–800, slip op. at 12 (E.D.Pa. August 25, 1981). Finally, as discussed later, the plaintiff has been ordered as a result of this action to pay only a reasonable royalty to the defendant for its infringement of the patented invention. slip op. at 19. The Court believes such a royalty allows plaintiff to recover its production and development costs incurred in the manufacture and sale of the infringing device, and in fact to retain a profit from such sale. *Id.* For all of the above reasons, this Court must, therefore, deny plaintiff's motion to set aside the finding of the jury that the plaintiff failed to prove by a preponderance of the evidence that plaintiff acquired intervening rights under the '292 patent.

The jury answered the following interrogatory in the negative:

9. Do you find that plaintiff has proved by a preponderance of the evidence that it has acquired intervening rights under United States Patent No. 3,387,292?

Sufficient evidence supports this finding. Further, this Court must also deny plaintiff's motion to set aside the jury findings that the plaintiff failed to prove with sufficient evidence that the '292 patent was invalid for late claiming and failure to file a supplementary oath.

The jury answered the following interrogatories in the negative:

4. Do you find that plaintiff has proved by clear and convincing evidence that United States Patent No. 3,837,292 is invalid on the ground that the amendment to the patent application filed on April 18, 1972 required a supplemental oath or declaration in that the amendment contained matter originally shown or described but not substantially embraced in the statement of invention or claim originally presented in the application?

5. Do you find that the plaintiff has proved by clear and convincing evidence that United States Patent No. 3,387,292 is invalid for late claiming?

The jury also answered the following interrogatory affirmatively:

2. Do you find that defendant has proved by a preponderance of the evidence that the effective filing date of the invention claimed in United States Patent No. 3,837,292 is August 22, 1969?

These answers are supported by sufficient evidence, and by the law. For all of the above reasons, the plaintiff's motion for judgment notwithstanding the verdict and, in the alternative, for a new trial will be denied.

### Damages Issues

#### Rule 60(a) motion

Following entry of this Court's judgment on August 26, 1981, the defendant filed a motion pursuant to Fed.R.Civ.P. 60(a) to correct a clerical mistake in the judgment. A stipulation of the parties had been entered into prior to entry of judgment, which was intended to make clear the number of car sets sold by the plaintiff during the relevant period. This stipulation was filed with the Court, but for some unexplained reason, was not entered into the record

until after the Court had calculated the damages and entered judgment. The defendant therefore seeks to correct the figures stated at page 25 of this Court's August 25, 1981 Memorandum on damages to reflect the stipulated figures. Plaintiff agrees that the judgment should be corrected. A revised table with the correct figures, computed on the same basis as was the original table, is as follows:

| | RDI Carsets Shipped | Royalty ($35.00/ Carset) | Royalty with Compound Interest at 6% |
|---|---|---|---|
| 12/1/74 − 4/30/75 | 2,406.75 | 84,236 | 124,400 |
| 5/1/75 − 4/30/76 | 5,043.00 | 176,505 | 245,977 |
| 5/1/76 − 4/30/77 | 6,805.00 | 238,175 | 312,105 |
| 5/1/77 − 4/30/78 | 7,145.00 | 250,075 | 309,493 |
| 5/1/78 − 4/30/79 | 9,488.00 | 332,080 | 386,807 |
| 5/1/79 − 4/30/80 | 13,296.00 | 465,360 | 513,013 |
| 5/1/80 − 2/9/81 | 7,999.75 | 279,991 | 291,191 |
| TOTAL | 52,183.50 | 1,826,422 | 2,182,986 |

The plaintiff, however, objects on substantive grounds to the inclusion of 204.75 carsets shipped in December, 1974, and to the inclusion of 1,671 carsets shipped in 1977 and 1978 which represent "foreign sales". The plaintiff also objects to the inclusion of interest. We reject these objections for the reasons stated below in our discussion of plaintiff's motion to alter or amend the judgment. Plaintiff also requests a clarification of the manner in which the interest figures were calculated. The interest was calculated at an annually compounded 6% rate from January 1st of each year (approximately the midpoint of each fiscal year for which data was supplied) to August 26, 1981, the date judgment was entered. Decimals were rounded to the nearest hundredth. Each royalty figure was thus multiplied by 1.04 to represent the interest accruing from January 1, 1981 to August 26, 1981. (237 days ÷ 365 days = .65, .65 × .06 = .04) Each royalty figure was also multiplied by a factor of $(1.06)^n$, where "n" was equal to the number of years between January 1 of the fiscal year in which those royalties would have been paid and January 1, 1981. As an example, in fiscal 1978, the royalty payment we have deemed should have been paid was $250,075. Since three years elapsed between 1978 and 1981, "n" is equal to three. 1.06 raised to the third power is 1.19, which multiplied by 1.04 and 250,075 yields the result of $309,493. In accordance with the above calculations the judgment will be amended to enter judgment in favor of defendant and against plaintiff in the amount of $2,182,986.

*Rule 59 motions*

Both parties moved pursuant to Fed.R. Civ.P. 59 for an alteration or amendment of the amount of the judgment, contending that this Court made errors in arriving at the amount of the damages. The contentions raised in these motions are identical to the arguments presented by the parties before the Court prior to the Court's initial determination of damages. Furthermore, it appears that all of them were considered by the Court in its Memorandum of August 25, 1981. Upon reconsideration, the Court concludes that neither party has presented any reason to change the basis for this Court's determination of damages, except the mathematical error brought about by the absence of the stipulation at the time damages were initially calculated. Therefore, the motions of both parties to alter or amend the judgment will be denied. The motion to correct the clerical error in the calculation of damages will be granted.

 The plaintiff challenges this Court's award of prejudgment interest. Such an award is discretionary with the trial court. *Georgia-Pacific Corp. v. U.S.*

*Plywood Champion Papers, Inc.*, 446 F.2d 295, 301 & n. 7 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). The Court in its previous Memorandum explicitly found that "exceptional circumstances" justified an award of prejudgment interest. Memorandum of August 25, 1981 at 24. The plaintiff takes issue with our finding, contending that its failure to enter into a license agreement with the defendant cannot support such a finding, and that it is contrary to public policy to penalize challenges to invalid patents. As the Third Circuit noted soon after this Court's Memorandum as to damages was filed, however, sound public policy dictates an award of prejudgment interest as of the date of infringement, since failure to award such interest "rewards infringers where those infringers have refused to accept or negotiate a royalty, and discourages the amicable licensing of patents." *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 364 (3d Cir.1981), *cert. granted*, 456 U.S. 988, 102 S.Ct. 2267, 73 L.Ed.2d 1283 (1982), *cert. denied*, 456 U.S. 990, 102 S.Ct. 2270, 73 L.Ed.2d 1285 (1982).[12] *See Pitcairn v. United States*, 547 F.2d 1106, 1120–24, 212 Ct.Cl. 168 (1976), *cert. denied*, 434 U.S. 1051, 98 S.Ct. 903, 54 L.Ed.2d 804 (1978). Moreover, the Court's finding was not simply that the plaintiff had refused the offer, but that it did not respond to it and proceeded to sell its infringing snubber in substantial quantities. Memorandum at 24. Finally, the Court found, in its discretion, that the award of prejudgment interest was necessary in this case to insure full compensation to the defendant for plaintiff's acts of infringement. *Id.* The Court finds that the 6% rate of interest is most reasonable and warranted by the facts of this case.

■ Plaintiff also contends that the royalty set by the Court was unreasonably high. The Court's Memorandum of August 25, 1981 considered each of the fifteen factors set out in the lower court opinion in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. at 1120, and we adhere to our earlier determinations with respect to these factors. Although plaintiff points out that in our Memorandum of August 25, 1981 this Court referred to a royalty arrangement offered by defendant to plaintiff as an "exclusive" arrangement, there is no question that our determination that a thirty-five dollar per carset royalty rate was reasonable was not based on our inadvertent reference to the license as "exclusive". Rather, it was based on all of the factors considered by the Court, including the exact language of the offer itself. We note that our ultimate finding, which placed reliance on the royalty arrangement offered by Stucki to RDI, is supported by two federal appellate courts which have considered this issue and have explicitly approved royalty rates in the amount of industrywide license offers made by the patentee. *Devex Corp. v. General Motors Corp.*, 667 F.2d at 361–62.[13] *Pitcairn v. United States*, 547 F.2d at 1116–17. We thus find no basis to change our original determination as to the royalty rate.

■ The plaintiff further contends, relying on *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) that its foreign sales should be excluded from the damages calculations because these snubbers were not placed in truck assemblies in this country, and therefore there was no infringement within this country. As the *Deepsouth* opinion states, however, infringement oc-

**12.** The Supreme Court's grant of certiorari in *Devex* was limited solely to the question of whether 35 U.S.C. § 284 *requires* an award of prejudgment interest on unliquidated reasonable royalty patent infringement damages where there has been *no* finding of bad faith or other exceptional circumstances, but rather a finding that the infringer acted in good faith. 50 U.S. L.W. 3870 (April 27, 1982). Even should the Supreme Court answer this question in the neg-

ative, we do not believe its holding will affect the power of a Court, in its discretion, to award prejudgment interest on the basis of findings such as we have made here.

**13.** The Supreme Court denied certiorari on this question in the *Devex* case. *See* note 12, *supra;* 50 U.S.L.W. 3870 (April 27, 1982).

curs under 35 U.S.C. § 271 when a person " 'makes', 'uses', *or* 'sells' the patented product within the bounds of this country." 406 U.S. at 527, 92 S.Ct. at 1706 (emphasis added). Plaintiff's contention is therefore untenable, since it is not only the use of a patented device which constitutes infringement under § 271, but manufacture and sale as well. Therefore, although the snubbers at issue were shipped for use outside the United States, since they were manufactured and sold within the United States, they should not be excluded from the damages calculation.

Finally, plaintiff contends that damages should not be assessed for December, 1974 because defendant has not proved that defendant marked its patented device to give notice of the issuance of the patent, or that defendant otherwise gave plaintiff actual notice of the patent's issuance, prior to January 1, 1975. The Court found in its Memorandum of August 25, 1981, at 21, that notice had been given as of December 1, 1974. The evidence, including the testimony of the inventor that marked snubbers were sold soon after marked castings were received in November, 1974, supports this finding.

For the reasons heretofore discussed, plaintiff's motion to alter or amend the judgment will be denied.

■■■ The defendant has also challenged some of this Court's findings. Defendant claims that the Court erred in finding that defendant did not carry its burden of proving lost profits. Memorandum of August 25, 1981, at 9. Defendant, however, has failed to convince the Court that it should change the findings set forth in the Court's Memorandum of August 25, 1981, at 7–9, which provided ample support for the finding that defendant had not carried its burden of proving lost profits. There was no evidence in the record upon which this Court could base a finding as to the percentage of the plaintiff's infringing sales which would have been made by the defendant in the absence of infringement. The defendant also asserts that the Court's damage award to Stucki should give Stucki

all of plaintiff's profits from the sale of plaintiff's infringing snubber, contending that plaintiff has been "unjustly enriched" in this amount. Such as award cannot be made, however, under 35 U.S.C. § 284, as amended in 1946. The Supreme Court has stated:

In patent nomenclature what the infringer makes is 'profits'; what the owner of the patent loses by such infringement is 'damages' . . . . By the 1946 amendment . . . the statute [the present 35 U.S.C. § 284] was changed to approximately its present form, whereby only "damages" are recoverable. The purpose of the change was precisely to eliminate the recovery of profits as such and allow recovery of damages only.

$\cdot$ $\cdot$ $\cdot$ $\cdot$ $\cdot$

But the present statutory rule is that only "damages" may be recovered. These have been defined by this Court as "compensation for the pecuniary loss he [the patentee] has suffered from the infringement, without regard to the question whether the defendant has gained or lost by his unlawful acts."

*Aro Manufacturing Co. v. Convertible Top Co.*, 377 U.S. 476, 506, 507, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964) (citations and footnotes omitted). Defendant's claim for disgorgement of RDI's "unjust enrichment" must, on the authority of *Aro*, be rejected.

For all of the above reasons, defendant's motion to alter or amend the judgment will therefore be denied.